# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# MILWAUKEE DIVISION

| | |
|---|---|
| PAKITA MCKINNEY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br> v. <br><br> NORTH SHORE AGENCY, LLC, and SANDVIK PUBLISHZING INTERACTIVE, INC., d/b/a EARLY MOMENTS, <br><br> Defendants. | Case No.: 19-cv-678 <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **Jury Trial Demanded** |

## INTRODUCTION

1. This class action seeks redress for collection practices that violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA") and the Wisconsin Consumer Act, Chs. 421-427, Wis. Stats.

## JURISDICTION AND VENUE

2. The court has jurisdiction to grant the relief sought by the Plaintiff pursuant to 15 U.S.C. § 1692k and 28 U.S.C. §§ 1331, 1337 and 1367. Venue in this District is proper in that Defendants directed their collection efforts into the District.

## PARTIES

3. Plaintiff Pakita McKinney is an individual who resides in the Eastern District of Wisconsin (Milwaukee County).

4. Plaintiff is a "consumer" as defined in the FDCPA, 15 U.S.C. § 1692a(3), in that Defendant sought to collect a debt from her allegedly incurred for personal, family, or household purposes.

5. Defendant North Shore Agency, LLC ("NSA") is a foreign corporation with its principal place of business located at 270 Spagnoli Road, Suite #110, Melville, NY 11747.

6. NSA is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

7. NSA is engaged in the business of collecting debts owed to others and incurred for personal, family or household purposes.

8. NSA is a debt collector as defined in 15 U.S.C. § 1692a.

9. Defendant Sandvik Publishing Interactive, Inc. ("Early Moments") is an online retailer with its primary offices in the State of Connecticut. It operates under the "fictitious" (in the legal sense) or trade name "Early Moments."

10. Operating primarily over the internet, Early Moments sells "book clubs," which are packages of childrens' books, on credit. Under a model similar to the Columbia House and BMG music clubs of the 1990s, additional books are shipped and billed monthly unless the customer opts out or cancels membership.

11. Early Moments conducts significant business in the State of Wisconsin.

12. Early Moments routinely engages in misrepresentation in its debt collection activities against Wisconsin citizens, including charging improper fees that are actually finance charges under Wisconsin law.

13. Early Moments is a "merchant" as defined in the WCA, as it has, or claims to have, sold consumer goods – childrens' books – to Plaintiff on credit. Wis. Stat. § 421.301(25) ("The term [merchant] includes but is not limited to a seller, lessor, manufacturer, creditor, arranger of credit and any assignee of or successor to such person.").

14. The WCA's debt collection chapter applies to all persons collecting, either directly or indirectly, consumer debts, including debts owed to themselves.

15. The Western District of Wisconsin has noted: "Unlike the FDCPA, the Wisconsin Consumer Act does not provide exceptions to its general definition of a debt collector." *Hartman v. Meridian Fin. Servs.*, 191 F. Supp. 2d 1031, 1048 (W.D. Wis. 2002).

16. The Wisconsin Department of Financial Institutions ("DFI") has likewise designated merchants and creditors as "Debt Collectors" under the WCA:

> Anyone attempting to collect a debt arising from a consumer credit transaction in Wisconsin, whether a merchant doing its own debt collecting or a third-party debt collector, must follow Wisconsin's debt collection law, Ch. 427, Wis. Stats. This is an important point because many merchants collecting debt owed directly to them mistakenly believe that they are exempt from Wisconsin's debt collection law because they are not included within the definition of "debt collector" under the federal Fair Debt Collection Practices Act.

https://www.wdfi.org/wca/business_guidance/creditors/debt_collection/.

17. Early Moments uses ordinary collection methods such as mail and telephone communications and third-party debt collectors, including Northshore, to collect allegedly defaulted debts.

18. Early Moments is a debt collector as that term is defined in Wis. Stat. § 427.103.

## FACTS

### *Early Moments communications*

19. Plaintiff allegedly ordered a package of books (the "Books"), on credit, from Early Moments, on or around July 27, 2018.

20. The credit obtained was for less than $25,000, and was not incurred for anything other than personal or household use.

3

21. A copy of a billing statement that Early Moments sent to Plaintiff on or around September 19, 2018, is attached as Exhibit A.

22. The total due was allegedly $23.45, and the bill requested payment by October 10, 2018. Exhibit A.

23. Exhibit A refers to the $23.45 amount as "PAST DUE."

24. On or around October 24, 2018, Early Moments mailed a debt collection letter to Plaintiff regarding the alleged debt for the Books. A copy of the letter is attached as Exhibit B.

25. Exhibits A and B both state: "A special charge of $2.99 may be added to each monthly reminder bill to cover postage and handling (not a finance charge)."

26. Upon information and belief, Exhibit A already included one or more "special charges" in the total due. Exhibit A was sent to Plaintiff after at least one regular billing cycle would have passed since the original order. Exhibit A states: "Our records indicate that we have not yet received your payment." Exhibit A also represents that the total due is "PAST DUE." Exhibit A also includes an asterisk by the "Amount Now Due," which points to the "special charge" language referenced above.

27. Exhibit B sought to collect the amount due for the Books and a $2.99 "special charge" for the period of time between the sending of Exhibits A and B.

28. Exhibit B represents the total due to be $25.94. This amount is the "Total Amount Due" for the Books, all prior "special fees," and another $2.99 "special fee."

29. The second "special fee" is attributed to the same alleged debt as the first "special fee."

30. Despite Early Moment's claim that the "special fee" is "not a finance charge," the fee is, in fact, a finance charge.

4

31. The WCA defines a "finance charge" as "the sum of all charges, payable directly or indirectly by the customer as an incident to or as a condition of the extension of credit, whether paid or payable by the customer, the creditor or any other person on behalf of the customer to the creditor or to a 3rd party unless the creditor had no notice or knowledge of the charges paid or payable to the 3rd party. Wis. Stat. § 421.301(20).

32. Charges that are not permissible are also considered finance charges. Wis. Stat. § 422.202(3). For example, while parties are permitted to contract for a delinquency charge, such charge may not exceed the lesser of $10 or 5% of the installment, and may only be collected once per installment. Wis. Stat. §§ 422.203(1), (3).

33. Early Moments charged Plaintiff more than one $2.99 special fee on the same installment, and the charge also exceeds 5% of the entire balance of Plaintiff's account, let alone a single installment. Exhibits A, B.

34. Because some or all of the "special fee" is actually a finance charge, Plaintiff's contract with Early Moments was for goods (specifically, books), and involved agreements to purchase goods and defer payment, under which finance charges, including but not limited to the "special fees," were or could be imposed. Such agreements are "consumer credit transactions." Wis. Stat. § 421.301(10).

35. Chapter 427 of the Wisconsin Statutes, part of the Wisconsin Consumer Act, regulates debt collectors and debt collection activities. The statute reads, in relevant part:

> 427.104 Prohibited Practices. (1) In attempting to collect an alleged debt arising from a consumer credit transaction or other consumer transaction, … where there is an agreement to defer payment, a debt collector may not …
>
> > j   Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist; …

5

36. Nothing in any alleged agreement between Plaintiff and Early Moments allows Defendant to charge multiple, $2.99 late fees on a single account.

37. Even if an alleged agreement between Plaintiff and Early Moments purports to allow Defendant to charge multiple, $2.99 late fees on a single account, such language is void as contrary to Wisconsin law for exceeding the maximum delinquency charge and for adding multiple charges to the same installment. Wis. Stat. §§ 422.203(1) and (3).

38. Notwithstanding that the "special fee" exceeds the maximum delinquency charge under Wis. Stat. §§ 422.203(1) and (3), $2.99 far exceeds any reasonable "shipping and handling" charge. A bulk letter like Exhibits A and B cost pennies to produce and mail. The "special fee" is unreasonable and would allow Early Moments to add hundreds or thousands in fees, far exceeding the price of the product, if taken to its logical extreme.

39. Upon information and belief, it is Defendant's regular practice to add multiple late fees to allegedly delinquent consumer accounts, despite that neither the underlying contract nor Wisconsin law, permit this action.

40. Defendant knew or should have known that it had no basis to add multiple late fees to a single balance. It has been sued for the same conduct before. *Tammy Ward vs. Sandvik Publishing Interactive Inc.*, Milwaukee County Case Number 2016CV003005 (filed April 20, 2016).

41. Plaintiff was confused and misled by Exhibits A and B.

42. The unsophisticated consumer would be confused and misled by Exhibits A and B.

43. Plaintiff had to spend time and money investigating Exhibits A and B, and the consequences of any potential responses to Exhibits A and B.

## NSA Letters

44. On or about January 11, 2019, NSA mailed a debt collection letter to Plaintiff regarding an alleged debt owed to "EARLY MOMENTS/SANDVIK PUBLISHING." A copy of this letter is attached to this complaint as Exhibit C.

45. Upon information and belief, the alleged debt referenced in Exhibit C was incurred as the result of the purchase of goods and services on credit, which were used only for personal, family, or household purposes.

46. Upon information and belief, Exhibit C is a form letter, generated by computer, and with the information specific to Plaintiff inserted by computer.

47. Upon information and belief, Exhibit C is a form, initial communication, debt collection letter used by NSA to attempt to collect alleged debts.

48. Upon information and belief, Exhibit C was the first letter that NSA sent to Plaintiff regarding the alleged debt referenced therein.

49. The reverse side of Exhibit C contains the FDCPA validation notice (*see* 15 U.S.C. § 1692g(a)):

> Unless you notify this office within 30 days after receipt of this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receipt of this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receipt of this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

50. Exhibit C also states:

> With all communications, whether oral or in writing, please include or have available a copy of this letter or information from reverse side to allow us to identify this account.

51. The text in NSA's letter to Plaintiff and the class is inconsistent with 15 U.S.C. § 1692g(a), which states:

> (a) **Notice of debt; contents**
> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—
>
> (1) the amount of the debt;
>
> (2) the name of the creditor to whom the debt is owed;
>
> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
>
> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
>
> (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

52. NSA's language imposes additional requirements on debtors wishing to dispute a debt.

53. NSA also misleads debtors as to what they actually need to do to dispute a debt.

54. NSA's actions have the practical effect of discouraging individuals from exercising their dispute rights.

55. <u>Exhibit C</u> states: "With all communications, whether oral or in writing, please include or have available a copy of this letter or information from reverse side to allow us to identify this account." However, nothing in 15 U.S.C. § 1692g(a) requires that a copy of the letter or the consumer's account information be included in a written dispute.

8

56. Failure to provide the correct validation notice, or overshadowing it with confusing, contradictory, or apparently contradictory language, is a *per se* violation of the FDCPA. No analysis of materiality of the error or omission is required. *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 324 (7th Cir. 2016) ("we have not extended the implicit materiality requirement of § 1692e to reach claims under § 1692g(a).").

57. For the purposes of Plaintiff's claims under 15 U.S.C. § 1692e, false statements to the effect that the consumer must "jump through hoops" that are not specified in the FDCPA in order to communicate disputes, are materially false statements.

58. In general, false, misleading or confusing statements about the debt itself, or about the creditor's, debtor's or debt collector's rights or intentions, are all material. *Hahn v. Triumph Partnerships LLC*, 557 F.3d 755, 757-58 (7th Cir. 2009).

59. NSA's language imparts in the unsophisticated consumer a false belief about the requirements to dispute a debt. *See Mikolajczyk v. Universal Fid., LP*, 2017 U.S. Dist. LEXIS 24587, at *11 (E.D. Wis. Feb. 22, 2017) (misrepresentation that consumer should provide a reason for dispute was material because it "may dissuade her from exercising her unfettered right under the FDCPA to dispute the debt.").

60. The unsophisticated consumer would be confused by the language in NSA's letter. The unsophisticated consumer would interpret the requests for copies of the letter or account information as requirements. *See, e.g. Boucher v. Fin. Sys. of Green Bay*, 880 F.3d 362, 367, n.1 (7th Cir. 2018); *quoting Lox v. CDA, Ltd.*, 689 F.3d 818, 825 (7th Cir. 2012) ("[C]onditional language, particularly in the absence of any language clarifying or explaining the conditions, does not insulate a debt collector from liability.").

61. The consumer would be misled into believing that a written dispute sent without the "North Shore Agency letter or coupon, or your complete account information" would be disregarded or otherwise not treated as a dispute, even though NSA would actually have to treat such a communication as a dispute. The unsophisticated consumer, however, does not know this.

62. NSA's additional requirements are unnecessary. Upon information and belief, NSA could easily match Plaintiff's name to her account, even if she did not include any of the additional information NSA requests. The unsophisticated consumer does not know this either.

63. Upon information and belief, the sole purpose of NSA's language requesting a copy of the letter or "complete account information" be sent with "all communications" is to waste the consumer's time and/or to make the consumer believe that the dispute process is burdensome, thereby reducing disputes. *See, e.g.*, *Walters v. PDI Management Services*, 02-CV-1100-JDT-TAB, 2004 WL 1622217 at *18-20 (S.D. Ind., April 6, 2004), *modified by Walters v. PDI Management Services*, 2004 WL 2137513 (S.D. Ind., Jun 14, 2004) (certified mail "requirement" violated 15 U.S.C. § 1692g(a) because, in part and independent of the additional cost, it wastes the consumer's time taking the letter to the post office).

64. The unsophisticated consumer cannot be expected to own a photocopier, scanner or fax machine, or have free access to one. In order to create a copy of NSA's letter, the consumer would have to pay for a copy to be made at a commercial location.

65. Debt collectors have an incentive to avoid processing dispute letters. While the debt collection process is primarily automated, disputes must be processed by hand, and sometimes by an attorney's hand. Written disputes both cause debt collectors to incur costs of time and money to validate debts and put the collector at risk of FDCPA liability for the subsequent communications related to validation. *See, e.g.*, *Haddad v. Alexander, Zelmanski, Danner &*

10

*Fioritto, PLLC*, 758 F.3d 777, 785-86 (6th Cir. 2014) (debt collector's response to consumer's verification request was insufficient and violated 15 U.S.C. §§ 1692e and 1692g). Debt collectors may likewise be concerned that creditors, who must also respond to requests for validation, would be hesitant to use debt collectors whose letters prompt disputes, "wasting" creditors' time by requiring responses.

66. Thus, the purpose and effect of NSA's additional requirement language is to discourage consumers from disputing debts by making the consumer believe, falsely, that additional, unnecessary steps are necessary to submit disputes.

67. Furthermore, Exhibit C includes the following representation:

> CREDITOR: EARLY MOMENTS/SANDVIK PUBLISHING
> RE: Dr. Seuss & His Friends
> Creditor Account #: ▇▇▇▇2213▇▇▇
> Creditor Tel: (866) 538-7323
> Amount Due: $29.43

68. Exhibit C further states: "Amount due includes late charge(s) assessed by our client."

69. The "Amount Due" listed in NSA's debt collection letter, Exhibit C, sent almost three months after Exhibit B, is $29.43, which is exactly $3.49 greater than "Amount Now Due" listed by Exhibit B.

70. Upon information and belief, the "special charge" referenced by Exhibits A & B accounts for such differences in the amount of the alleged debt.

71. Exhibit C overstates the amount of the debt by adding an additional dollar to the "special charge" referenced by Exhibits A & B.

11

72. Plaintiff was confused and misled by Exhibit C.

73. The unsophisticated consumer would be confused and misled by Exhibit C.

74. Plaintiff had to spend time and money investigating Exhibit C, and the consequences of any potential responses to Exhibit C.

### *The FDCPA*

75. The FDCPA creates substantive rights for consumers; violations cause injury to consumers, and such injuries are concrete and particularized. *Derosia v. Credit Corp Solutions*, 2018 U.S. Dist. LEXIS 50016, at *12 (E.D. Wis. Mar. 27, 2018) ("'a plaintiff who receives misinformation form a debt collector has suffered the type of injury the FDCPA was intended to protect against' and 'satisfies the concrete injury in fact requirement of Article III.'") (quoting *Pogorzelski v. Patenaude & Felix APC*, 2017 U.S. Dist. LEXIS 89678, 2017 WL 2539782, at *3 (E.D. Wis. June 12, 2017)); *Spuhler v. State Collection Servs.*, No. 16-CV-1149, 2017 U.S. Dist. LEXIS 177631 (E.D. Wis. Oct. 26, 2017) ("As in Pogorzelski, the Spuhlers' allegations that the debt collection letters sent by State Collection contained false representations of the character, amount, or legal status of a debt in violation of their rights under the FDCPA sufficiently pleads a concrete injury-in-fact for purposes of standing."); *Lorang v. Ditech Fin. LLC*, 2017 U.S. Dist. LEXIS 169286, at *6 (W.D. Wis. Oct. 13, 2017) ("the weight of authority in this circuit is that a misrepresentation about a debt is a sufficient injury for standing because a primary purpose of the FDCPA is to protect consumers from receiving false and misleading information."); *Neeley v. Portfolio Recovery Assocs., LLC*, 268 F. Supp. 3d 978, 982 (S.D. Ind. Aug. 2, 2017) ("[N]othing in *Spokeo* overruled the Seventh Circuit's decisions that emphasized and affirmed the power of Congress to pass legislation creating new rights, which if violated, would confer standing under Article III.") (alteration in original) (quoting *Saenz v. Buckeye Check Cashing*, 2016 U.S. Dist.

LEXIS 127784, at *5 (N.D. Ill. Sep. 20, 2016); *Qualls v. T-H Prof'l & Med. Collections, Ltd.*, 2017 U.S. Dist. LEXIS 113037, at *8 (C.D. Ill. July 20, 2017) ("Courts in this Circuit, both before and after *Spokeo*, have rejected similar challenges to standing in FDCPA cases.") (citing "*Hayes v. Convergent Healthcare Recoveries, Inc.*, 2016 U.S. Dist. LEXIS 139743 (C.D. Ill. 2016)); *Bock v. Pressler & Pressler, LLP*, No. 11-7593, 2017 U.S. Dist. LEXIS 81058 *21 (D.N.J. May 25, 2017) ("through [s]ection 1692e of the FDCPA, Congress established 'an enforceable right to truthful information concerning' debt collection practices, a decision that 'was undoubtedly influenced by congressional awareness that the intentional provision of misinformation' related to such practices, 'contribute[s] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy,'"); *Quinn v. Specialized Loan Servicing, LLC*, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); *Lane v. Bayview Loan Servicing, LLC*, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); *Church v. Accretive Health, Inc.*, No. 15-15708, 2016 U.S. App. LEXIS 12414 *7-11 (11th Cir. July 6, 2016) (same); *see also Mogg v. Jacobs*, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

76. Moreover, Congress has explicitly described the FDCPA as regulating "abusive practices" in debt collection. 15 U.S.C. §§ 1692(a) – 1692(e). Any person who receives a debt collection letter containing a violation of the FDCPA is a victim of abusive practices. *See* 15 U.S.C. §§ 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses").

77. 15 U.S.C. § 1692e generally prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

78. 15 U.S.C. § 1692e(10) specifically prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt."

79. 15 U.S.C. § 1692g states, in part:

> (a) **Notice of debt; contents**
> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—
> …
>> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
>>
>> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
>>
>> (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with

14

> the name and address of the original creditor, if different from the current creditor.
>
> (b) Disputed Debts
> …
> Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

## COUNT I – FDCPA

80. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

81. Count I is brought against Defendant NSA.

82. By requiring the consumer "include a copy of North Shore Agency letter or coupon, or your complete account information, with all communications," Exhibit C is false, deceptive, and misleading as to whether such additional information must be included along with any written dispute or request for varication in order to trigger the consumer's rights under the FDCPA.

83. By requiring the consumer "include a copy of North Shore Agency letter or coupon, or your complete account information, with all communications," Exhibit C contradicts and overshadows the validation notice.

84. By adding additional requests that the unsophisticated consumer would interpret as requirements, NSA is attempting to discourage consumers from disputing debts in writing.

85. NSA violated 15 U.S.C. §§ 1692e, 1692e(10), 1692g(a)(3), 1692g(a)(4), 1692g(a)(5), and 1692g(b).

## COUNT II – FDCPA

86. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

87. Count II is brought against Defendant NSA.

88. By stating "Amount due includes late charge(s) assessed by our client," <u>Exhibit C</u> is false, deceptive, and misleading as the amount, character, and legal status of Plaintiff's alleged debt.

89. Furthermore, <u>Exhibit C</u> misstates the amount of Plaintiff's alleged debt by adding an additional $1.00.

90. NSA violated 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(10), and 1692g(a)(1).

## COUNT III

91. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

92. Count III is brought against both defendants.

93. In <u>Exhibits A and B</u>, Defendant attempted to collect "special fees" from customers, including Plaintiff, when neither the terms of the contract nor Wisconsin law permit Defendant to add "special fees" to accounts.

94. The special fees are finance charges, to the extent that they exceed the maximum permissible delinquency charge. Wis. Stat. §§ 422.202(3), 422.203(1), (3).

95. Such conduct violates Wis. Stat. § 427.104(1)(j).

## CLASS ALLEGATIONS

96. Plaintiff brings this action on behalf of a Class, consisting of (a) all natural persons in the State of Wisconsin (b) who were sent a collection letter in the form represented by <u>Exhibit C</u> to the complaint in this action, (c) seeking to collect a debt allegedly owed to Early Moments, (d) which debt included any amount attributed to a "special charge" (e) and which debt was

16

Case 2:19-cv-00678-WED     Filed 05/08/19     Page 16 of 18     Document 1

incurred for personal, family, or household purposes, (f) between May 8, 2018 and May 8, 2019, inclusive, (g) that was not returned by the postal service.

97. The Class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the Class.

98. There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the Defendant complied with the FDCPA.

99. Plaintiff's claims are typical of the claims of the Class members. All are based on the same factual and legal theories.

100. Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

101. A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

## JURY DEMAND

102. Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendant for:

(a) actual damages;

(b) statutory damages;

(c) iInjunctive relief;

(d) attorneys' fees, litigation expenses and costs of suit; and

(e) such other or further relief as the Court deems proper.

Dated: May 8, 2019

                                  **ADEMI & O'REILLY, LLP**

                By:    /s/ John D. Blythin
                          John D. Blythin (SBN 1046105)
                          Mark A. Eldridge (SBN 1089944)
                          Jesse Fruchter (SBN 1097673)
                          Ben J. Slatky (SBN 1106892)
                          3620 East Layton Avenue
                          Cudahy, WI 53110
                          (414) 482-8000
                          (414) 482-8001 (fax)
                          jblythin@ademilaw.com
                          meldridge@ademilaw.com
                          jfruchter@ademilaw.com
                          bslatky@ademilaw.com